UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------x

DEMARIANO FAGAIRO,

                Petitioner,

     - against -

THE PEOPLE OF THE STATE OF NEW
YORK,

                Respondent.

------------------------------------------x

04 Civ. 2763 (TPG)

**OPINION**

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  5/11/09
```

         DeMariano Fagairo, a state prisoner, has filed a habeas petition pursuant to 28 U.S.C. § 2254.  Petitioner claims the following: (1) the procedure by which he was arrested was improper and unlawful, (2) the identification of him as the suspect was untrue and inaccurate, (3) his right to a speedy trial was violated, and (4) his trial counsel was ineffective for failing to (a) demand the production of evidence, (b) introduce his personal property into evidence, and (c) marshal evidence in support of his defense.

         The habeas petition is denied and dismissed.

FACTS

On March 26, 1999, petitioner and Pedro Vargas were indicted on two counts of Criminal Sale of a Controlled Substance in the Third Degree, New York Penal Law § 220.39(1), two counts of Criminal Sale of a Controlled Substance In or Near School Grounds, New York Penal Law § 220.44(2), and one count of Criminal Possession of a Controlled Substance in the Third Degree, New York Penal Law § 220.16(1).[1]

On December 7, 1999, New York Supreme Court Justice Dorothy A. Cropper held a suppression hearing to determine whether any of the identifications or physical evidence implicating petitioner had been obtained illegally. Petitioner's counsel argued that the physical evidence recovered from petitioner following his arrest had been seized pursuant to an unlawful arrest, because there had been insufficient evidence to establish probable cause for the arrest. She further argued that the confirmatory identifications of petitioner as the suspect were impermissibly suggestive. At the end of the hearing, Justice Cropper summarily denied petitioner's motions to suppress in their entirety. On December 8, 1999, petitioner proceeded to trial before Justice Cropper and a jury. During this trial, the People's account of what occurred on

---

[1] On August 23, 1999, Vargas pled guilty to Attempted Criminal Sale of a Controlled Substance in the Third Degree, New York Penal Law § 220.39(1). He was sentenced to an indeterminate three to six year prison term on September 8, 1999, and did not appeal.

March 20, 1999 differed substantially from that of petitioner. The People's account follows.

On March 20, 1999, undercover N.Y.P.D. detectives Manuel Madera, Tyrone Viruet, and James McCabe attended a pre-buy meeting in preparation for an undercover police drug operation. Madera was assigned to be the buyer, Viruet, his backup officer, and McCabe, the arresting officer on the field team. McCabe gave both Madera and Viruet pre-recorded buy money to be used for their drug buys that night. Eight other officers were assigned to support Madera and Viruet as members of the field team. That night, Detectives Madera and Viruet drove to the area of West 146th Street and Riverside Drive in Manhattan. They then noticed a line forming in front of 546 West 146th street, a building later determined to be 339 feet from P.S. 153, a public elementary school. Madera immediately got in line behind four or five people, while Viruet stayed across the street so he could observe Madera. However, because his view was blocked by a car, Viruet decided to cross the street and get in line behind Madera to ensure Madera's safety.

Madera and Viruet noticed that two men, who they later identified as petitioner and Vargas, were at the front of the line directing people to stay in line. At a certain point, petitioner and Vargas began taking orders and dealing drugs to the people in line. Vargas would ask each person what he wanted, then take the person's money and hand it to petitioner, while informing petitioner of the person's request.

Petitioner would then give the drugs to Vargas, who would hand them to the buyer.  Before it was Madera's turn in line, both Madera and Viruet observed this exchange of cash for drugs with two or three people who were in line ahead of them.

When Madera reached the front of the line, Vargas asked him how many he wanted, to which Madera responded two tins[2] and handed Vargas $20 of pre-recorded buy money.  Vargas handed the money to petitioner and asked for two.  Petitioner then handed Vargas two tins, which Vargas gave to Madera.  At that point, Viruet reached the front of the line and asked for one, while handing over $10 of pre-recorded buy money to Vargas.  Again, Vargas handed the money to petitioner, and requested one, but this time, petitioner handed the tin directly to Viruet.

During this exchange with Viruet, Madera had left the area to radio a transmission to the backup team that he had completed a drug transaction with two men standing in front of 546 West 146th Street. During this transmission, Madera referred to petitioner as "J.D. Wool Cap."  While Madera first recalled at trial that he had described petitioner as a dark-skinned Hispanic man wearing a black wool cap and a black jacket, he was later corrected that in his original radio transmission, he had described petitioner as a black man.  Madera explained that while both petitioner and Vargas were dark-skinned, he

---

[2] Two "tins" refers to aluminum foil square packets of crack cocaine.

knew Vargas was Hispanic because he had heard him speak, while he had never heard petitioner's voice during the transactions. Once Viruet completed his transaction, he too left the area and radioed the backup team. He described petitioner as wearing a wool knit cap and a black jacket with red lining. He also testified at trial that he had described petitioner as a black man in his Buy Report, because petitioner was dark-skinned. Using his portable radio, Viruet informed McCabe that petitioner was inside the lobby of 546 West 146th Street.

In response to the communications by Madera and Viruet, McCabe and other backup officers drove toward 546 West 146th Street. McCabe then entered the lobby of the building. There, McCabe saw petitioner, who matched the description he had received. No one else was in the lobby at that time. McCabe then identified himself as a police officer, handcuffed petitioner, and searched him. He discovered seventeen tins of crack cocaine in petitioner's right, front jacket pocket, as well cash in petitioner's left, rear pants pocket, which included $20 of pre-recorded buy money. McCabe then brought petitioner outside, and Viruet confirmed over the radio that he was one of the sellers. By this time, Vargas was also in police custody outside 546 West 146th Street. Madera then drove himself and Viruet past 546 West 146th Street, where they had unobstructed views of petitioner and Vargas, who were both then in custody. Both Madera and Viruet confirmed that petitioner and Vargas were the men who had sold them cocaine.

Back at the precinct, Madera field-tested the contents of the two tins he had bought, and determined that they each contained cocaine. On March 22, 1999, N.Y.P.D. chemist Leslie Maguet analyzed the contents of the tins bought by Madera and Viruet and concluded they contained cocaine. Finally, on December 8, 1999, N.Y.P.D. chemist Pushpa Jethanandani re-analyzed the contents of the seventeen tins recovered from petitioner upon his arrest, and determined that each of them contained cocaine.

Petitioner's trial testimony of the events that unfolded on March 20, 1999 varies considerably from the account described above. At trial, petitioner testified as the sole witness in his defense. He stated that he was an American Choctaw Indian. He admitted having a drug problem from 1988 to 1999, including using crack cocaine "off and on." He also admitted that he had been previously convicted of two misdemeanors and two drug felonies. However, he testified that in one case, he was falsely accused, in another, he had been entrapped, and in another, a police report had been fabricated.

Petitioner testified that, on the night in question, he was on 58th street between Fifth and Madison Avenues in Manhattan at around 9PM, wearing green camouflage pants, a blue t-shirt, a black Fila jacket with a red emblem on the back, a black Nike skullcap, and brown boots. He testified that while he was walking down the street outside an expensive hotel, a blond man got out of a limousine and asked petitioner

whether he knew anyone with "hard-core street-type hip-hop music." When the blond man asked petitioner whether he had a demo tape, petitioner replied "not yet." The blond man identified himself as a producer from Atlanta, Georgia, who was making a movie about "the street" called "the Last Savage." Petitioner testified that following a forty five minute conversation between him and the man, they both took a taxi to West 146th Street and Broadway. Upon arrival, the man gave him a "bankroll" of money to help petitioner return home to Chicago, as well as four $50 bills with which to buy the man drugs. Petitioner stated that he then told the man to wait in the taxi while he went to buy drugs.

Petitioner testified that he walked up 146th Street and at about 10:20PM approached a dealer named "Smiley," a dark-skinned black man wearing a light brown coat and a black skullcap, who was standing at the front of the building on 546 West 146th Street. Petitioner told Smiley that he wanted "twenty." Smiley unlocked the door to the building at 546 West 146th Street, asked petitioner to step inside, and placed five tins in petitioner's hand. Petitioner then gave him the four $50 bills from the blond man. While petitioner continued to follow Smiley inside the building, Smiley gave him fourteen additional tins, so that petitioner had a total of nineteen. However, petitioner testified that he returned two of these tins because they were "wrinkled," and placed the remaining seventeen in his front, right jacket pocket. Smiley then stated that he had no more tins to sell, and returned $30 to petitioner.

Petitioner testified that he put this money in his left, front pants pocket. At this point, Smiley went inside an apartment and locked the door.

When petitioner turned around, five plainclothes police officers were coming into the building, including one officer who petitioner "had a prior problem with." Petitioner asserted that detective McCabe was not among these officers. Petitioner testified that the officers ordered him against the wall and patted him down. One of the officers then found $30 in petitioner's front, left pants pocket, and seventeen tins in his right, front jacket pocket. Petitioner testified that he was then detained in front of the building, because four or five other officers were "beating up somebody" on the street. During a strip search at the precinct, the officers recovered the "bankroll" from petitioner's pocket, though petitioner claims that they took and threw away the paper containing the movie producer's name and address.

After hearing these competing accounts of what transpired on March 20, 1000, the jury convicted petitioner on all counts on December 13, 1999. On January 12, 2000, petitioner was sentenced to an aggregate, indeterminate prison term of six to twelve years imprisonment.

On December 21, 2000, petitioner filed a pro se motion to vacate his conviction under New York Criminal Procedure Law ("CPL") § 440.10. He contested the accuracy of the chemists' testimony concerning the lab analysis of the tins recovered in the case, the failure

of the court to provide a <u>Frye</u> hearing to assess the admissibility of certain expert testimony, the admission of various evidence at trial, and the behavior of the prosecutor, including her conduct at trial and her failure to disclose evidence. He further contested the effectiveness of his trial counsel, the specificity of the indictment against him, and the lawfulness of his arrest. He also suggested that there were improprieties in the grand jury proceedings. The State Supreme Court denied his motion in an opinion dated March 15, 2001. Petitioner then moved for leave to appeal, which was granted by the Appellate Division on July 26, 2001.

On about December 13, 2000, petitioner's initial appellate counsel, Robert Dean, filed a brief on petitioner's behalf on direct appeal. On February 6, 2001, petitioner filed a supplemental brief pro se, which was 118 pages long, in which he also raised a number of claims. On July 28, 2001, petitioner filed a pro se supplemental amendment to his supplemental brief asserting additional claims. On October 4, 2001, the Appellate Division granted the request of petitioner's initial counsel, Dean, to be relieved, and ordered that his brief be withdrawn. The court also ordered that petitioner's CPL § 440.10 appeal be consolidated with his direct appeal, and assigned Marlon G. Kirton as petitioner's new appellate counsel. On about September 4, 2002, Kirton filed a brief on petitioner's behalf in the Appellate Division. The People responded to all of petitioner's submissions in December 2002.

In a decision dated February 25, 2003, the Appellate Division unanimously affirmed petitioner's conviction and the denial of his CPL § 440.10 motion. The decision stated, in relevant part, that the verdict entered against petitioner "was based on legally sufficient evidence and was not against the weight of the evidence." The Court held that issues "concerning identification and credibility were properly considered by the jury and there is no basis for disturbing its determinations." The Court went on to state that the "record establishes that defendant received meaningful representation." The Court also held that petitioner's "remaining contentions, including those contained in his pro se supplemental brief, are unpreserved and we decline to review them in the interest of justice," and the Court added that were "we to review these claims, we would reject them." Petitioner moved for leave to appeal to the New York Court of Appeals, which was denied on June 24, 2003.

Petitioner filed a federal habeas petition challenging his conviction on July 25, 2002. However, Chief Judge Mukasey dismissed the petition without prejudice on December 23, 2002 to allow for exhaustion of state remedies. Petitioner then filed pro se the instant habeas petition on August 19, 2003. This Court initially dismissed the petition for lack of specificity on January 8, 2007, but petitioner requested reconsideration in a letter dated January 18, 2007. Petitioner also filed an appeal with the Second Circuit on January 22, 2007, which

was dismissed on September 1, 2007 for failure to pay the filing fee.  On February 23, 2007, this Court granted petitioner's request for reconsideration and reinstated the instant petition.

DISCUSSION

Timeliness

Before addressing the merits of the instant habeas petition, this Court must address whether the petition is time-barred.  The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") prescribes, in relevant part, a one year statute of limitations for state prisoners seeking federal review of their state court criminal convictions. 28 U.S.C. § 2244(d)(1).  This one year period begins to run from the date on which the state criminal conviction became final by the conclusion of direct review or by the expiration of the time for seeking direct review. Id. § 2244(d)(1)(A).

Petitioner was denied leave to appeal his conviction to the New York Court of Appeals on June 24, 2003.  His conviction thus became final ninety days later, on September 22, 2003, the date on which his time to seek a writ of certiorari to the Supreme Court expired. See McKinney v. Artuz, 326 F.3d 87, 96 (2d Cir. 2003).  Petitioner therefore had until September 21, 2004, one year from September 22, 2003, to file his habeas petition.  Petitioner filed the instant petition on August 19, 2003, within the required one year limitation period. Accordingly, the petition is timely.

Exhaustion of Remedies

Here, petitioner raises four claims in his habeas petition: (1) the procedure by which he was arrested was improper and unlawful, (2) the identification of him as the suspect was untrue and inaccurate, (3) his right to a speedy trial was violated, and (4) his trial counsel was ineffective for failing to (a) demand the production of evidence, (b) introduce his personal property into evidence, and (c) marshal evidence in support of his defense.   The State contends that petitioner has exhausted only his unlawful arrest and ineffective assistance claims, but not his identification and speedy trial violation claims.

An important corollary of the exhaustion rule, however, applies in the instant case: "a federal habeas court need not require that a federal claim be presented to a state court if it is clear that the state court would hold the claim procedurally barred."   Harris v. Reed, 489 U.S. 255, 263 n.9 (1989). While petitioner's speedy trial and identification claims may be unexhausted, petitioner is now unable to present these claims to the state courts.  Petitioner has already sought direct appeal of his conviction, including an application for leave to appeal to the New York Court of Appeals.   Therefore, according to New York procedural rules, petitioner is now barred from attempting to raise both his speedy trial and identification claims before the New York Court of Appeals, because he has already made the one request for leave to appeal his conviction to which he is entitled.   See Grey v. Hoke, 933 F.2d 117, 120-

21 (2d Cir. 1991); People v. Spence, 82 N.Y.2d 671, 619 N.E.2d 644, 601 N.Y.S.2d 566 (N.Y. 1993); Roa v. Portuondo, 548 F. Supp.2d 56, 78 (S.D.N.Y. 2008). Petitioner is also unable to file another CPL § 440.10 motion to raise these unexhausted claims, because the state courts would deny such a motion pursuant to CPL § 440.10(2)(c), which bars review if a claim could have been raised on direct review. Therefore, petitioner's speedy trial and identification claims are deemed exhausted and procedurally defaulted.

A federal court cannot review the merits of a procedurally defaulted claim unless the petitioner demonstrates (1) "cause for the default and prejudice" or (2) that "failure to consider the claim will result in a miscarriage of justice." Aparicio v. Artuz, 269 F.3d 78, 90 (2d Cir. 2001). Petitioner has failed to show cause and prejudice for his failure to alert the state courts to both the federal constitutional nature of his speedy trial claim, and his suppression claim related to his identification as the suspect. Petitioner was clearly given a fair opportunity to do so, as he submitted briefs on direct appeal totaling over 118 pages, in addition to the brief submitted on his behalf by his appellate counsel Kirton. Petitioner has similarly failed to assert how denying review of these claims would create a miscarriage of justice. Accordingly, petitioner's speedy trial and identification claims must be dismissed without reaching the merits. By contrast, petitioner's remaining claims

of ineffective assistance of counsel and unlawful arrest have been properly exhausted.

Unlawful Arrest Claim

Petitioner argues in this habeas petition that the police did not have probable cause to arrest him, and therefore his Fourth Amendment rights were violated when the police obtained physical evidence pursuant to his arrest.  Petitioner contends that this physical evidence should have been suppressed by the trial court, as it was the fruits of an unlawful arrest.  The State responds that Stone v. Powell, 428 U.S. 465 (1976), bars this claim from habeas review, because the State already provided petitioner with an opportunity for full and fair litigation of his Fourth Amendment claim.

In Stone v. Powell, the Supreme Court held that "where the state has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial."  Id. at 482.  The Second Circuit has held that New York's procedures for litigating Fourth Amendment claims offer such a "full and fair opportunity."  See Capellan v. Riley, 975 F.2d 67, 70 n.1 (2d Cir. 1992).  Therefore, federal review of petitioner's suppression claim "is not warranted unless he demonstrates that he was in fact precluded from utilizing" New York's procedures "by an unconscionable breakdown

in the review process." <u>Shaw v. Scully</u>, 654 F. Supp. 859, 864 (S.D.N.Y. 1987).

Petitioner had the opportunity to address his unlawful arrest claim at the pre-trial suppression hearing before Judge Cropper. The judge explored the issues of fact and law relevant to the question of probable cause and suppression of the fruits of the arrest. The prosecution presented detective McCabe to testify regarding the events leading up to the arrest, and petitioner's trial counsel was given the opportunity to cross-examine the detective. It is clear that at this hearing, petitioner had an "opportunity for full and fair litigation" of his Fourth Amendment claim concerning whether there was probable cause for his arrest, even though the court ultimately denied his suppression motions. In addition, petitioner was able to raise this probable cause claim again on direct appeal in his supplemental brief to the Appellate Division. There surely was no breakdown in the state procedures. Accordingly, pursuant to <u>Stone</u>, 428 U.S. 465, this Court is precluded from reviewing this claim, and the claim is dismissed.

<u>AEDPA Standard of Review</u>

Before proceeding to the merits of petitioner's remaining claim, this Court must address the proper habeas corpus standard of review under the AEDPA. In enacting the AEDPA, Congress imposed a more stringent standard of review, which provides, in relevant part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the

judgment of a State court shall not be granted
with respect to any claim that was adjudicated
on the merits in State court proceedings unless
the adjudication of the claim –

> (1) resulted in a decision that was contrary
> to, or involved an unreasonable
> application of, clearly established Federal
> law, as determined by the Supreme Court
> of the United States; or

> (2) resulted in a decision that was based
> on an unreasonable determination of the
> facts in light of the evidence presented in
> the State court proceeding.

28 U.S.C. § 2254(d).   In essence, where, as here, a state court has

previously adjudicated petitioner's remaining habeas claim of ineffective

assistance of counsel, this Court's review is constrained.

Petitioner asserts that he was denied the effective assistance

of counsel in violation of the Sixth Amendment, because his trial counsel

failed to (1) demand the production of evidence, (2) marshal evidence in

support of his defense, and (3) introduce his property, such as his

clothing, into evidence.

Petitioner raised these claims in his pro se briefs on direct

appeal.  In response, the Appellate Division held in its written decision

dated February 25, 2003 that the "record establishes that defendant

received meaningful representation."  The Appellate Division's denial of

petitioner's ineffective assistance claims was neither contrary to, nor

based on an unreasonable application of, Supreme Court law.  Indeed,

when the Appellate Division rejected petitioner's ineffective assistance

claim, it cited to a New York case that identified the leading Supreme Court case on the subject, <u>Strickland v. Washington</u> 466 U.S. 668 (1984). <u>See</u> <u>People v. Benevento</u>, 91 N.Y.2d 708, 713, 697 N.E.2d 584, 674 N.Y.S.2d 629 (N.Y. 1998).  While the Appellate Division stated in its written decision that petitioner received "meaningful representation," which is the New York state constitutional standard for evaluating ineffective assistance claims established prior to <u>Strickland</u>, the Second Circuit has repeatedly held that this standard is not "contrary to" the federal constitutional standard articulated in <u>Strickland</u>.  <u>See</u> <u>Lindstadt v. Keane</u>, 239 F.3d 191, 198 (2d Cir. 2001).

Plaintiff has failed to demonstrate that the Appellate Division unreasonably applied this governing law or that it issued a decision that was "based on an unreasonable determination of the facts in light of the evidence."  This is demonstrated by the description of the evidence earlier in this opinion.   One additional point to be specifically noted is petitioner's complaint about counsel's decision not to introduce his property into evidence at trial.  Counsel explained to the court during trial that while she had subpoenaed the clothing, she had decided, after reviewing all the evidence, not to introduce the clothing at trial. Petitioner has made no showing that this was an unreasonable decision.

## CONCLUSION

For the above reasons, this habeas corpus petition is denied and dismissed. Moreover, because petitioner has not made a substantial showing of the denial of a constitutional right, a Certificate of Appealability is not issued. See 28 U.S.C. § 2253(c).


Dated: New York, New York
May 11, 2009

SO ORDERED

Thomas P. Griesa
U.S.D.J.